**OFFICE OF THE FEDERAL PUBLIC DEFENDER**
**DISTRICT OF MARYLAND**
NORTHERN DIVISION
TOWER II, 9th FLOOR
100 SOUTH CHARLES STREET
BALTIMORE, MARYLAND  21201-2705
TEL: (410) 962-3962
FAX: (410) 962-3976
TOLL FREE: (855) 213-8450

JAMES WYDA  
FEDERAL PUBLIC DEFENDER

DARA JACKSON-GARRETT  
ASSISTANT FEDERAL PUBLIC DEFENDER

May 29, 2024

<u>**VIA CM/ECF**</u>

The Hon. Brendan A. Hurson
United States District Court
   for the District of Maryland
101 W. Lombard Street
Baltimore, Maryland 21201

      Re: *United States v. Bernard Edwards*, BAH-23-0377

Dear Judge Hurson:

      Mr. Bernard Edwards, 34 years old, is scheduled to appear before Your Honor on June 12, 2024, for a sentencing hearing. As this Court knows, Mr. Edwards pled guilty on April 18, 2024, to one count of possession of a firearm and ammunition by a prohibited person in violation of 18 U.S.C. §922(g) (Count One). The parties have entered into a written plea agreement pursuant to Rule 11(c)(1)(C) that provides for a sentence of between 60-78 months of imprisonment in the Bureau of Prisons. For the reasons stated below, and to be argued at sentencing, Mr. Edwards asks this Court to sentence him to 60 months of incarceration followed by 3 years of supervised release. A sentence of 60 months, is sufficient, but not greater than necessary, to satisfy the goals of sentencing under 18 U.S.C. § 3553(a).

**<u>Introduction</u>**

      In this case, whether the Guidelines are 46-57 months of imprisonment (the Defense's position) or 57-71 months of incarceration (the Government's position), Mr. Edwards has pled guilty under a Rule 11(c)(1)(C) plea agreement that guarantees he will receive an *above*-Guidelines sentence under the Defense's position or a guidelines sentence under the Government's position. That is significant, as courts in this District frequently impose below-Guidelines sentences in a wide variety of cases.

      Mr. Edwards does not dispute that the conduct in this case is serious. It is noteworthy that the Guidelines already account for the severity of his offense: the number of guns involved in the case and the fact that two of the guns had machinegun conversion devices. There is no allegation

1

that the firearms involved were used in connection with any drug trafficking or any other felony offense. Moreover, when law enforcement came to execute the search warrant at his home, Mr. Edwards voluntarily disclosed the presence of firearms for officer safety. His cooperation extended through quickly accepting responsibility here once his case was indicted federally.

This is Mr. Edwards first federal conviction. The sentence this Court imposes will be Mr. Edwards' first lengthy sentence as a father since his daughters were born in 2021. Over the last 11 months, Mr. Edwards has had time to reflect on his desire to be a present father and how facing the consequences in this case will prevent him from doing so. It is in this context that Mr. Edwards' hopes to make different choices upon his release so that he can be an active, present, and loving father.

Finally, a reflection of the § 3553(a)(2) goals of sentencing reflect that a sentence of 60 months is one that is sufficient but not greater than necessary. There is nothing to indicate that the Government's requested 78-month sentence will provide more deterrence, more public safety, or more punishment than a 60-month sentence. In fact, a 60-month sentence is supported by sentencing data and trends among federal courts—notably in this District. To sentence Mr. Edwards to a sentence beyond 60 months' imprisonment would be greater than necessary.

## Argument

I.  **An above-guidelines sentence of 60 months is appropriate in light of the applicable guidelines range, the offense conduct, and Mr. Edwards' early and prompt acceptance of responsibility.**

The Defense argues the guidelines are 46-57 months' imprisonment (21/III). While the Government argues the guidelines are 57-71months' imprisonment (23/III). All parties agree that Mr. Edwards falls within a criminal history category III based on a criminal history score of 6 points (based on two prior convictions). PSR ¶ 35-36. The difference lies in the parties' disagreement about Mr. Edwards' base offense level. *See* Plea Agreement ¶ 6(a)(b). The Defense's position is that Mr. Edwards' base offense level is 20 because the offense involved a firearm that is described in 26 U.S.C. § 5845(a), and Mr. Edwards was a prohibited person at the time of the instant offense. § 2K2.1(a)(4)(B).

*The Defense objects to the base offense level in the Presentence Report* at ¶ 18 because Mr. Edwards disagrees with the Government and Probation that his prior convictions for assault first degree and use of a firearm in commission of a crime of violence is a crime violence under §2K2.1(a)(3). However, Federal Rule of Criminal Procedure 32(i)(3)(B) provides the Court with a grounds not to decide the parties' dispute. Under that rule, the Court need not rule on "any disputed portion of the presentence report" or "determine that a ruling is unnecessary either because the matter will not affect sentencing, or because the court will not consider the matter in sentencing." There are multiple reasons here why the Court need not rule on this issue.

Nonetheless, under either calculation, a sentence of 60 months' imprisonment is appropriate in light of the offense conduct, which is already incorporated into the guidelines' calculation, and Mr. Edwards' early and prompt acceptance of responsibility.

2

     **a.**      **Mr. Edwards' prior conviction for Maryland use of a firearm in commission of a felony or crime of violence (specifically, Maryland first-degree assault) fails to qualify as a "crime of violence" under U.S.S.G. § 4B1.2(b) because it can be committed with the reckless use of force.**

Section 2K2.1 (the felon-in-possession guideline) defines a "crime of violence" via a cross-reference to U.S.S.G. § 4B1.2(a). Accordingly, for purposes of the felon-in-possession guideline, "crime of violence" (in relevant part) is defined as an "any offense under federal or state law" that:

> (1) has as an element the use, attempted use, or threatened use of physical force against the person of another [known as the "force clause"]

U.S.S.G. § 4B1.2(a).

To determine whether Maryland use of a firearm in commission of a crime of violence[1] or felony (here, Maryland first degree assault) (Md. Code, Crim. Law § 4-204(b)) qualifies as a federal "crime of violence" under § 4B1.2(a), this Court must apply the categorical approach. *United States v. Simmons*, 917 F.3d 312, 317 (4th Cir. 2019). Under this approach "the facts of a given offense" are irrelevant. *Borden v. United States*, 593 U.S. 420, 424 (2021). "The focus is instead on whether the elements of the statute of conviction" satisfy the "crime of violence" definition. *Id.* "If any—even the least culpable—of the acts criminalized" under the statute do not match the terms of either the force clause or the enumerated clause, then the prior offense categorically fails to qualify as a § 4B1.2 "crime of violence." *Id.*

Applying the categorical approach, Maryland use of a firearm in the commission a first-degree assault is not a § 4B1.2(a) "crime of violence" under the force clause because it can be committed with the reckless use of force. Indeed, in *Borden*, the Supreme Court held that crimes that can be committed with the reckless use of force or less are not "violent felonies" under the Armed Career Criminal Act (ACCA) force clause (18 U.S.C. § 924(e)(2)(B)(i)). 593 U.S. at 423-24. Because the ACCA force clause is identical to the § 4B1.2(a)(1) force clause, *Borden* equally applies to the analysis here to disqualify Mr. Edwards' Maryland use of a firearm conviction as a § 4B1.2(a) "crime of violence."

Application Note 1 to § 4B1.2(a) combined with the Fourth Circuit's decision in *United States v. Redd*, 85 F.4th 153 (4th Cir. 2023) makes plain that Maryland use of a firearm in the commission of a first-degree assault can be committed with the reckless use of force, and thus, cannot constitute a § 4B1.2(a) "crime of violence." Starting with Application Note 1, it provides that a conviction for use of a firearm in connection with a "crime of violence" under 18 U.S.C. § 924(c) only qualifies as a § 4B1.2(a) "crime of violence" if the underlying predicate offense

---

[1] It bears noting that the "crime of violence" label Maryland assigns to certain crimes (like Maryland first degree assault) has no impact on whether the offense qualifies as a federal "crime of violence" under § 4B1.2(a). Rather, what matters is whether the elements of the Maryland crime satisfies the federal "crime of violence" definition. *See United States v. Proctor*, 28 F.4th 538, 551 (4th Cir. 2022) ("whether the Maryland legislature chose to list a crime as a crime of violence" has no relevance in determining whether the offense qualifies as a "violent felony" under the ACCA force clause).

3

qualifies as a § 4B1.2 "crime of violence." There is no reason why this same logic should not apply to Maryland use of a firearm in commission of a crime of violence (which operates the same way as § 924(c) with two basic elements: (1) use of a firearm (2) in connection with an underlying offense that constitutes a crime of violence). *See* Maryland Pattern Jury Instruction 4:35.4.

Under this reasoning, because the underlying predicate of Maryland first degree assault (Md. Code, Crim. Law § 3-203) fails to qualify a § 4B1.2(a) "crime of violence," then so does use of a firearm in connection with that crime. To be clear, in *United States v. Redd*, 85 F.4th 153 (4th Cir. 2023), the Fourth Circuit recently held that Maryland first degree assault categorically fails to qualify as a "violent felony" under the ACCA—which is the same as the § 4B1.2 force clause—after *Borden* because it can be committed with the reckless use of force (specifically by *recklessly assaulting someone with a firearm*). Thus, under the terms of Application Note 1, because Maryland first degree assault does not qualify as a § 4B1.2 "crime of violence," then Maryland use of a firearm in commission with first degree assault also does not qualify as a § 4B1.2(a) "crime of violence." In other words, if the underlying offense of first-degree assault can be committed recklessly, then so can the use of a firearm in commission of that offense.

In short, Maryland use of a firearm in the commission of first-degree assault categorically fails to qualify as a § 4B1.2(a) "crime of violence," and in turn, Mr. Edwards' base offense level is 21 under U.S.S.G. § 2K2.1.

      **b.**    **Regardless of the guidelines range, 60 months—an above-guidelines sentence —is the appropriate sentence in this case.**

A sentence of 60 months, which is above the Defense's guidelines range, and within the Government's guidelines range, already takes into account the seriousness of the offense and all of the offense conduct in this case. The Guidelines calculation penalizes Mr. Edwards with a higher base offense level that takes into account that two of the guns had a machinegun conversion device, with a 2-level enhancement because the offense involved between three and seven firearms, a 2-level enhancement because the offense involved a stolen firearm.

While the guidelines already account for Mr. Edwards' acceptance of responsibility, they do not account for the relatively quick timing of his acceptance of responsibility or some of the mitigating circumstances in this case. As stated, when officers executed a search warrant on Mr. Edward's three-bedroom home, he voluntarily disclosed that the guns were in his bedroom upstairs. The guns were recovered in Mr. Edwards' bedroom in/on his dresser, under his bed, and in a closet. The majority of the ammunition was found inside safe or in a backpack under the bed. No one was injured when Mr. Edward' fled days prior to the search warrant. He was in the car alone and at 12:25 a.m. on a Thursday it is unlikely that there were very many people on the road. His continued acceptance of responsibility continued when his case came into federal court. Mr. Edwards had an initial appearance on December 7, 2024 and indicted his willingness to plea just four months later. The Government extended a plea offer on April 2, 2024. He signed the plea agreement on April 10, 2024.

**II.  Sentencing Mr. Edwards to 60 months reflects his emotionally distant childhood, chaotic teenager years, the impact of his brother's death, and his desire to change his life's trajectory.**

   **a.  Mr. Edwards had a traumatic upbringing that not surprisingly led to touches with the criminal legal system.**

Mr. Edwards was born at Johns Hopkins Hospital on December 23, 1986, to his mother, Jackie Jones, and his father, Bernard Edwards, Sr. He lived with his parents and his siblings in Madison-Eastend. His mother's family lived in the same neighborhood. His parents' marriage, however, was short lived—they separated when he was just four years old. After the separation, his relationship with his father was sporadic. Until high school, Mr. Edwards saw and spoke to his father inconsistently. Today, it has been two decades since Mr. Edwards has spoken to his father.

After his parents separated, his mother was a single mother raising Mr. Edwards and his 3 siblings—his older brother Andre, his younger sister, Bernardta, and his younger brother, Jamal. His mother moved the family to McElderry Park. Mr. Edwards was the closest with Andre. He looked up to him as the only male role model in his life as a child and into his teenage years.

As a child, Mr. Edwards' mother often worked hard and long hours. By the time Mr. Edwards was in middle school, he was largely taking care of himself and watching his little sister after school. In light of her work hours, Mr. Edwards only really saw his mother on weekends. By this time, his older brother and role model, Andre, was out in the streets selling drugs. Watching his brother and looking for a way to put clothes on his back and food in his stomach, Mr. Edwards was lured into life on the streets. He became a corner boy selling drugs in his neighborhood at just 14 years old. At such a young age, it was easy to be influenced by the older men in his neighborhood who promised him all the things he lacked: a father figure, mentorship, food, money, and community.

In the background, he faced abuse from his mother. While it is commendable that she worked to keep a roof over their heads, her method of discipline was harsh. She would use all kinds of objects—from yard sticks to metal bats—to beat Mr. Edwards and his siblings. His mother never told him she loved him. She never hugged him. They rarely communicated about how he is doing in school or how things were going for him. His home life was emotionally cold and physically violent. He lacked the love and support children need to succeed.

By high school Mr. Edwards was living what he describes as a double life. His mother enrolled him at Archbishop Curly High School in the 9th grade. Mr. Edwards would wake up and go to school, only to return home to sell drugs on the corner in his neighborhood. Not surprisingly, by 16, Mr. Edwards had his first contact with the criminal legal system when he was arrested for the first time. His attention and focus on school became less and less. His grades slipped. In the 12th grade, he enrolled in Patterson Park High School. Showing his resilience, he managed to graduate high school on time in 2005.

A year after graduating high school, at just 19 years old, he was convicted of his first crime and sentenced to 10 years. This set off a lengthy period of time (approximately a decade and a

5

half), during which he spent his most impressionable years surrounded by poor role models largely in prison. Further traumatic, while he was incarcerated, his older brother, Andre, was shot multiple times in East Baltimore and died.[2] Andre's untimely death devastated Mr. Edwards given their close relationship. Mr. Edwards describes it as something that deeply affected him. An additional punishment during his incarceration was not being able to pay his final respects to his brother. He has never received mental health treatment nor was he assessed after his brother's death.



2 Briana (L), Mr. Edwards (C), Brielle (R)

Mr. Edwards was released in December 2020. He began working at Class Produce on January 25, 2021 and worked there until his arrest in this case in June 2023. He worked up to becoming an assistant supervisor.

Mr. Edwards is a loving father to two daughters. His first daughter, Brielle, was born on May 7, 2021. He met her mother, a longtime friend, Nicole Dorsey, in 2008. His second daughter, Briana was born on October 24, 2021, to Mr. Edwards and his wife, Nicole Dorsey. Currently, Mr. Edwards and his wife are separated but maintain a co-parenting relationship. The birth of his two daughters brought about new financial pressures. Under this pressure, Mr. Edwards returned to the only life he has really known—



1 Briana (L), Mr. Edwards (C), and Brielle (R) at Brielle's 2nd birthday

the streets. This led him down the path to make the decisions that put him in front of this Court for sentencing.

Mr. Edwards loves his daughters. In describing his relationship with his daughters, he said "The best thing that ever happened to me is having my girls. Words cannot express the love I have for them." He is an active father—he goes to all of their events from doctor's visits to birthdays to school events, and sees them frequently.

### c. Mr. Edwards is serious about getting his life back on track for his daughters.

Mr. Edwards has been incarcerated since June 23, 2023. Over the last 11 months, he has had time to reflect on his life and his future. He loves his two daughters more than anything in the world. His time incarcerated in this case will be the first time that Mr. Edwards is apart from his daughters since they were born. He has expressed sadness over missing a large chunk of their lives while he is incarcerated. The lengthy period of incarceration that Mr. Edwards faces in this case is different than any of other period of incarceration because today he is a father. He takes full responsibility that his actions have led to his absence in his daughters' lives. After two decades in the streets, Mr. Edwards had come to believe that his life had no value. Mr. Edwards' daughters

---

[2] "Confronting Crime," *The Baltimore Sun* (Aug. 27, 2007), https://www.baltimoresun.com/2007/08/27/confronting-crime-280/.

have changed his outlook. This combined with his realization of how much time he will be away from his daughters has been a wake-up for Mr. Edwards. His daughters are the primary motivator for wanting to improve the trajectory of his life.

Importantly—because it shows insight and a desire to better himself—he has expressed an interest in mental health treatment while in the Bureau of Prisons (BOP). His interest in mental health treatment stems from realizing all the ways he never processed his brother's death and the impact of his past on who he is today. He would also like to take a CDL class and avail himself of the work training programs at the BOP. These resources – mental health treatment and vocational training –could be continued with the help of U.S. Probation once he is released.

While Mr. Edwards has prior periods of incarceration, he has only been on state probation one time when he was 18 years old. His two most recent lengthy periods of incarceration did not include any probationary period. He has never had access to the resources that U.S. Probation can offer. In the past he was released with little to no support. His time on federal supervised release will be different. Not only does Mr. Edwards want to continue doing mental health treatment upon his release, he hopes to do some job training, and find gainful employment.

### III. Incarceration beyond 60 months will not provide more deterrence, more punishment, nor more rehabilitation.

The imposition of the Government's requested 78-month sentence will not accomplish more than the 60-month sentence requested by Mr. Edwards. An additional 18 months of incarceration will not provide more deterrence, more punishment, or more rehabilitation. A 60-month sentence followed by a lengthy period of supervised release will ensure that the goals of sentencing are met.

*First*, as to specific deterrence, Mr. Edwards has been specifically deterred. His daughters, and this recent time away from them, have been all the deterrence he needs to get his life back on track. While this will not be the longest sentence Mr. Edwards has served, the extended time away from his daughters has made this time different.

*Second*, as to general deterrence, there is no evidence that additional jail time beyond 60 months provides a meaningful deterrent effect. "Criminological research over several decades and in various nations generally concludes that enhancing the certainty of punishment produces a stronger deterrent effect than increasing the severity of punishment." *See* Valerie Wright, The Sentencing Project, *Deterrence in Criminal Justice: Evaluating Certainty Versus Severity of Punishment* 4 (Nov. 2010).[3]  Daniel Nagin, a leading deterrence scholar, concludes that "[t]he evidence in support of the deterrent effect of the certainty of punishment is far more consistent and convincing than for the severity of punishment" and that "the effect of certainty rather than severity of punishment reflect[s] a response to the certainty of apprehension." Daniel S. Nagin, *Deterrence in the Twenty-First Century: A Review of the Evidence*, Crime & Justice, Vol. 42, No. 2013.  This finding is echoed elsewhere. *See* National Research Council, National Academies Press, *The Growth of Incarceration in the United States: Exploring Causes and Consequences* 90 (2014)[4]

---

[3] https://www.sentencingproject.org/wp-content/uploads/2016/01/Deterrence-in-Criminal-Justice.pdf.
[4] https://www.nap.edu/read/18613/chapter/1.

("Three National Research Council studies have examined the literature on deterrence and concluded that insufficient evidence exists to justify predicating policy choices on the general assumption that harsher punishments yield measurable deterrent effects. Nearly every leading survey of the deterrence literature in the past three decades has reached the same conclusion." (citations omitted)); Ray Paternoster, "How Much Do We Really Know About Criminal Deterrence?", 100 J. Crim. L. & Criminology 765, 801 (2010) ("Certainty of punishment is generally considered to be more important than the severity of that punishment."). In fact, "increasing already long sentence," as the government seeks to do here by requesting an additional 18 months, "has no material detrimental effect." National Research Center, *supra,* at 140.

The Department of Justice's National Institute of Justice has issued its own guidance reflecting that "[i]ncreasing the severity of punishment does little to deter crime" and "[t]he certainty of being caught is vastly more powerful deterrent than the punishment." *See* U.S. Department of Justice, Office of Justice Programs, National Institute of Justice, *Five Things About Deterrence* 1-2 (May 2016).[5] The reasons for this result are complicated but lay, in part, in recognizing that severe punishment does not "chasten" defendants in the way most people think. "Some policymakers and practitioners believe that increasing the severity of the prison experience enhances the 'chastening' effect, thereby making individuals convicted of an offense less likely to commit crimes in the future." *Id*. In fact," the guidance notes, "scientists have found no evidence for the chastening effect." *Id*. This is further supported by common sense. In the context of firearm offenses, it seems unlikely that Mr. Edwards or people situated similarly will be deterred more by a 78-month sentence than a 60-month sentence. A 60-month sentence—is no different from a 78-month sentence. It is a lengthy period of time away from loved ones and a significant period of incapacitation.

*Third*, longer sentences do not enhance public safety. As noted by Dr. Wright:

> The logic behind supporting harsher sentences is simple: locking up people for longer periods of time should enhance public safety. From this view, putting people in prison for years or even decades should prevent offenders from re-offending by incapacitating them and/or deterring would-be-offenders from committing crimes. However, contrary to deterrence ideology and "get tough" rhetoric, the bulk of research on the deterrent effects of harsher sentences fails to support these assertions.

Wright, *supra*, at 6 (citing Anthony Doob & Cheryl Webster, *Sentence Severity and Crime: Accepting the Null Hypotheses*, Crime & Justice, 30:143-195, 2003). In fact, longer sentences have actually been found to *increase* recidivism. *Id*. (detailing a substantial meta-analysis of studies and finding that "longer prison sentences were associated with a three percent increase in recidivism").

*Lastly*, while § 3553(a)(2)(D) requires the Court to consider "the need for the sentence imposed . . . to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner," this purpose militates strongly in

---

[5] https://www.ncjrs.gov/pdffiles1/nij/247350.pdf.

favor of a sentence of 60 months. Congress has explicitly directed that "imprisonment is not an appropriate means of promoting correction and rehabilitation." 18 U.S.C. § 3582(a). In other words, incarceration neither achieves nor is a substitute for rehabilitation or achieving the goals set forth in § 3553(a)(2)(D). Thus, sentencing Mr. Edwards to 18 more months of incarcerated cannot be justified on the basis of offering him any rehabilitation, education, or vocational training. *See Tapia v. United States*, 564 U.S. 319 (2011).

In sum, the government cannot point to any evidence that 78 months of incarceration will meaningfully ensure that these particular goals of sentencing are met more than a sentence of 60 months of incarceration. In conclusion, anything more than 60 months is "more than necessary" under § 3553(a).

IV. **A 60-month sentence is consistent with sentencing trends among federal courts, the Fourth Circuit, and this District, and avoids any unwarranted sentencing disparity.**

The data collected by the Sentencing Commission clearly demonstrates that a 60-month sentence is consistent with sentences imposed by all federal district courts, and well within the range of sentences imposed in the Fourth Circuit, especially this district. In FY 2022, the average sentence imposed, across all federal districts, for offenders convicted of §922(g) and not sentenced under the ACCA was 60 months.[6] Within the 4th Circuit, in FY 2023, the average sentence imposed was 46 months in firearms cases, where the guideline used was §2K2.1, the criminal history category was III, and excluding career offenders.[7]



---

[6] *See* United States Sentencing Commission, Quick Facts: 18 U.S.C. § 922(g) Firearms Offenses, 2022. https://www.ussc.gov/sites/default/files/pdf/research-and-publications/quick-facts/Felon_In_Possession_FY22.pdf

[7] *See Sentencing Commission Interactive Data Analyzer*, https://ida.ussc.gov/analytics/saw.dll?Dashboard. As noted at the bottom of the chart, the data includes only the 4th Circuit and covers firearms offenses where the primary guidelines used was 2K2.1 for individuals with a criminal history category III and excluded career offenders.

In the District of Maryland, the average sentence imposed with the same specifications was 38 months.[8] The sentencing trends and averages across all federal courts, the 4th Circuit, and this district weigh in favor of the above-guidelines sentence of 60 months.



## Conclusion

The purposes of sentencing—deterrence, punishment, incapacitation, and rehabilitation—can all be accomplished by sentencing Mr. Edwards to 60 months of incarceration, followed by 3 years of supervised release. In addition to the recommended conditions from U.S. Probation, Mr. Edwards request the Court order participation in a mental health treatment program. For the reasons stated above, Mr. Edwards respectfully requests that the Court sentence him as such. I thank the Court for its attention to this matter.

Respectfully submitted,

/s/
Dara Jackson-Garrett
Sasha Garcon
Assistant Federal Public Defenders

cc: Jacob Gordin, Assistant U.S. Attorney
    Jessica Jackson, U.S. Probation Officer

---

[8] *See Id.* As noted at the bottom of the chart, the data includes only the 4th Circuit, specifically Maryland District courts, and covers firearms offenses where the primary guidelines used was 2K2.1 for individuals with a criminal history category III and excluded career offenders.